# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |  |
|---|---|---|
| DISABILITY RIGHTS NORTH CAROLINA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:24CV352 |
| SAMUEL SCOTT PAGE (in his official capacity) and ROCKINGHAM COUNTY, | ) ) ) ) ) | |
| Defendants. | ) | |

## __ORDER__[1]

Plaintiff Disability Rights North Carolina ("DRNC" or "Plaintiff") brings a claim pursuant to 42 U.S.C. § 1983 ("§ 1983") and seeks declaratory and injunctive relief that would require Defendants Rockingham County Sheriff Samuel Scott Page ("Sheriff Page") and Rockingham County (collectively, "Defendants") to provide Plaintiff with immediate access to Rockingham County Detention Center ("RCDC") and the individuals housed therein pursuant to certain federal statutes. (Complaint ("Compl."), Docket Entry 1.) This matter is before the Court on one motion: Defendants' Motion to Dismiss. (Docket Entry 9; *see also* Docket Entry 10.) Plaintiff has filed a Response in Opposition. (Docket Entry 13.) Defendants have filed a Reply. (Docket Entry 16.) The United States of America has filed a

---

[1] By Order of Reference, this matter was referred to the undersigned to conduct all proceedings in this case pursuant to 28 U.S.C. § 636(c). (Docket Entry 17.)

Case 1:24-cv-00352-JLW    Document 18    Filed 03/11/25    Page 1 of 39

Statement of Interest pursuant to 28 U.S.C. § 517 supporting Plaintiff's position.[2] (Docket Entry 15.)

The matters are fully briefed. For the following reasons, the undersigned finds that this matter is ripe for adjudication, that Plaintiff has standing, and that issuing declaratory and injunctive relief would be premature at this juncture; and orders that Defendants' Motion to Dismiss is granted in part as to the § 1983 claims against Sheriff Page, as to all claims against Rockingham County, and otherwise denied. Furthermore, the undersigned orders that the parties participate in a Court-ordered mediated settlement conference and that the instant action is stayed pending resolution of said mediation.

## I.     BACKGROUND

Plaintiff alleges that DRNC, a non-profit corporation independent of state government, is the duly designated Protection and Advocacy ("P&A") system for individuals with disabilities in North Carolina. (Compl. ¶¶ 1, 9, 10 (citing 42 U.S.C. §§ 15001(b)(2), 15043, & 10805).) Plaintiff further alleges that DRNC is federally mandated and authorized, pursuant to several federal statutes and their implementing regulations, to monitor facilities housing disabled persons. (*Id.*

---

[2] "[A]ny officer of the Department of Justice[ ] may be sent by the Attorney General to any … district in the United States to attend to the interests of the United States in a suit pending in a court of the United States … or to attend to any other interest of the United States." 28 U.S.C. § 517. 28 U.S.C. § 517 authorizes the United States to move a court for leave to file a statement of interest. *United States ex rel. Thompson v. Apollo Path, LLC*, No. 3:20-CV-2917-D, 2025 WL 256979, at *2 (N.D. Tex. Jan. 21, 2025). "When the United States is not a party to a lawsuit, its motion for leave to file a statement of interest is akin to a motion for leave to file an *amicus* brief." *Id.* (collecting cases). "As with an *amicus* brief, the decision whether to permit a statement of interest lies solely within the court's discretion." *Id.* (cleaned up). Courts consider whether the proposed statement of interest is "timely, useful, or otherwise necessary to the administration of justice." *Id.* (citation omitted). Here, the undersigned finds that the United States' Statement of Interest is timely, useful, and helpful to the administration of justice. Therefore, to the extent, if any, that the United States requires leave to file its Statement of Interest, the Court exercises its discretion and hereby grants such leave.

¶¶ 5 (citing Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C. § 10801 *et seq.*; the Protection and Advocacy for Individuals with Developmental Disabilities Act ("PAIDD"), 42 U.S.C. § 15041 *et seq.*, the Protection and Advocacy of Individual Rights Act ("PAIR"), 29 U.S.C. § 794e, and the Protection and Advocacy for Persons with Traumatic Brain Injuries act ("PATBI"), 42 U.S.C. § 300d-53 (collectively, the "P&A Acts")), 11, 16.)

Plaintiff goes on to allege that the P&A Acts grant DRNC "reasonable unaccompanied access to monitor in facilities that provide services to people with disabilities and access to people with disabilities in any location where they are receiving services[,]" including jails like RCDC. (*Id.* ¶¶ 2, 18, 22.)[3]  Plaintiff alleges that "[d]isability" under the P&A Acts includes

> people with a significant mental illness or emotional impairment; people with a mental or physical impairment that manifests before age 22, is likely to continue indefinitely, results in substantial functional limitations requiring lifelong support, which is also referred to as an intellectual and/or developmental disability; individuals with a traumatic brain injury; and, individuals with disabilities that are not defined as a significant mental illness or intellectual/ developmental disability such as mobility impairments, hearing loss, visual impairments, diabetes, [and] substance use disorder, among others. *See* 42 U.S.C. §§ 10802, 15002(8)(A), & 300d-53; 29 U.S.C. § 794e(f).

(Compl. ¶ 17.)  Plaintiff alleges that jailed persons are more likely to have a disability than those who are not jailed. (*See id.* ¶ 18 n.1.)  Plaintiff alleges that it has "conduct[ed] monitoring visits at other jails throughout North Carolina pursuant to its access authority[.]" (*Id.* ¶ 25.)

Plaintiff goes on to allege that it notified Sheriff Page of its intent to monitor at RCDC, but that "Defendants are refusing to allow [DRNC] access to all areas of [RCDC] that

---

[3] Plaintiff also argues that the P&A Acts further obligate Defendants to allow DRNC access to RCDC to monitor because "all jails operating in North Carolina must provide medical and behavioral health services to people in their custody, which means RCDC is a provider of services, care, and/or treatment to people with disabilities[.]"  (Compl. ¶ 22.)

3

incarcerated persons can access and to speak to all individuals within RCDC, which are impermissible and unlawful limitations on [DRNC's] federal authority." (*Id.* ¶¶ 3-4, 21-22.) Plaintiff maintains that the P&A Acts require that the P&A system be provided with access to qualifying facilities and individuals immediately upon request with limited exceptions, and that if access is not "immediately provided, a written statement explaining the basis for the delay or denial of access must be timely provided." (*See id.* ¶ 20.)

Plaintiff alleges that numerous communications regarding Plaintiff's intent to monitor at RCDC were exchanged between DRNC and Defendants between January 2023 and April 2024. (*See id.* ¶¶ 23-33; *see also* Docket Entry 13-1.) Therein, Plaintiff argued that it was authorized to monitor RCDC and its residents generally, whereas Defendant argued that DRNC was entitled to access only if it wished to investigate a specific incident and/or could provide advance notification of which particular individuals it intended to interview. (*See id.* ¶¶ 23-26.) "Defendants also claimed to transfer, and not to keep individuals with mental illness and developmental disabilities in RCDC." (*Id.* ¶ 26.)

Despite this apparent impasse, a visit was eventually arranged for March 6, 2024. (*Id.* ¶ 27.) However, Plaintiff alleges that Defendants initially informed it that its monitoring would be restricted to "the booking and holding area of the jail and in the Magistrate's office" and that it "could only speak with incarcerated individuals who had been identified to Defendants in advance" of DRNC's visit. (*See id.* ¶¶ 27-28.) Plaintiff alleges that on March 7, 2024, Defendants informed it that it would "be permitted to monitor in the booking and holding area, in the Magistrate's office, *and* the nurse's station and control center." (*Id.* ¶ 29 (emphasis in original).) Again, Plaintiff disputed these restrictions; on April 3, 2024, Defendants informed DRNC that

it would be permitted to speak only with persons in the jail who signed a "consent form" distributed by Defendants ahead of DRNC's monitoring visit.  (*See id.* ¶¶ 30-31.)

Plaintiff alleges that on April 9, 2024, when DRNC visited RCDC to monitor, Defendants limited its time to access RCDC to two hours, failed to provide private meeting space, refused to provide access to cellblocks, restricted its communications to only those who had signed a consent form, and denied its request to return to RCDC after lunch that day to resume its monitoring and communication with jailed persons.  (*See id.* ¶¶ 32-33.)  Plaintiff alleges that Defendants' delays, limitations, and denial of access to RCDC were done under color of state law, were inconsistent with the P&A Acts, and impaired DRNC's ability to protect and advocate for persons with disabilities incarcerated at RCDC.  (*Id.* ¶¶ 34-36.)  Plaintiff lists two claims for relief in its Complaint: "First Cause of Action – The P&A Acts … Second Cause of Action – Section 1983[.]"  (Compl. at 9-10.)  Plaintiff seeks declaratory and injunctive relief and attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.  (*See id.* ¶¶ 36-40.)

Pursuant to Federal Rules of Civil Procedure 12(b)(1), (2), and (6), Defendants filed a Motion to Dismiss for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim upon which relief can be granted.  (Docket Entry 9 at 1.)[4]  Defendants append several attachments to their Motion to Dismiss, including affidavits of Sheriff Page, Rockingham County Sheriff's Office ("RCSO") Captain Windell Brown, and North Carolina Sheriff's Association Deputy General Counsel Matthew Boyatt (Docket Entries 9-1, 9-2, 9-3); as well as email correspondence between Matthew Boyatt ("Boyatt") and DRNC attorney

---

[4] Unless otherwise noted, all citations herein refer to the page numbers at the bottom right-hand corner of the documents as they appear in the Court's CM/ECF system.

5

Luke Woollard ("Woollard") in which Boyatt requests monitoring "policies and procedures" ahead of DRNC's visit to RCDC. (*See* Docket Entry 9-3 at 4-9.). In their brief in support of their Motion to Dismiss, Defendants argue that Plaintiff's claims for relief cannot be adjudicated because they are not ripe and because Plaintiff lacks standing. (*See* Docket Entry 10 at 3-13.) Defendants also argue that that Rockingham County is not a proper party to the instant action. (*See id.* at 13.)

In its memorandum in opposition to Defendants' Motion to Dismiss, Plaintiff argues that the instant action is ripe for review. (Docket Entry 13 at 8.) Plaintiff argues that the P&A Acts provide DRNC a presumptive right of immediate access to RCDC, that Defendants' factual assertions in support of its jurisdictional argument are contradicted by the parties' pre-suit correspondence, and that if "any questions remain regarding [DRNC's] standing, the Court should delay its decision until a later proceeding on the merits." (*Id.* at 8-15.) Plaintiff attaches 26 exhibits to its opposition memo that detail the correspondence between DRNC and Page and between DRNC and Clyde B. Albright, County Attorney for Rockingham County ("Albright"), from January 23, 2023, through April 8, 2024. (Docket Entry 13-1 at 1-141.)

Plaintiff further argues that Rockingham County should not be dismissed from this case because it operates RCDC and had actual notice of DRNC's efforts to monitor. (Docket Entry 13 at 15-19.) Plaintiff goes on to argue that Defendants' attempt to dismiss for lack of personal jurisdiction in their Motion to Dismiss fails because they abandoned that argument. (*Id.* at 19.) Lastly, within the correspondence attached to its opposition memo, Woollard states, "DRNC recently conducted monitoring visits at detention centers in Johnston, Carteret, Edgecombe, and Sampson counties without incident." (Docket Entry 13-1 at 63.)

In their Reply to Plaintiff's opposition memo, Defendants reiterate their arguments that the instant action should be dismissed because Plaintiff lacks standing and that Rockingham County should be dismissed as a defendant because it lacks the power to grant or deny Plaintiff the relief it requests. (Docket Entry 16 at 1-5.) Defendants also argue that they have "been unable to locate any cases interpreting the practical considerations of [granting jail access to a P&A system under the P&A Acts] and believe this to be a case of first impression." (*Id.* at 3.)

In its Statement of Interest, the United States argues that PAIMI grants broad authority to protect and advocate for the rights of individuals with disabilities, including by accessing facilities for the purposes of monitoring, educating, and investigating. (*See* Docket Entry 15 at 3-5.) It further argues that PAIMI requires facilities, including jails, to provide reasonable unaccompanied access. (*Id.* at 5-7.) Finally, the United States argues that Plaintiff is not required to provide a monitoring protocol as a prerequisite to obtaining access, and that, in fact, PAIMI requires a facility to provide a written explanation for denial or delay of access. (*Id.* at 7-8.)

## II.  **DISCUSSION**

### a. **This Court has personal jurisdiction over the parties in the instant action.**

Defendants challenge personal jurisdiction in the Motion to Dismiss. (Docket Entry 9 at 1.) But Defendants make no argument related to personal jurisdiction beyond a short reference to the standard (*see id.*; *see also* Docket Entries 10, 16); therefore, the Court deems this defense to be abandoned. *McClain v. Causey*, No. 1:20-CV-695, 2021 WL 111496, at *2 (M.D.N.C. Jan. 12, 2021) (unpublished); *Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir.1999) (deeming abandoned arguments unsupported by a litigant's brief); M.D.N.C. LR 7.2(a)(4) (requiring litigants to support their arguments with authorities). Defendants' Motion to Dismiss pursuant to Rule 12(b)(2) fails.

**b. This Court has subject-matter jurisdiction over the instant action.**

Defendants also challenge subject-matter jurisdiction in the Motion to Dismiss. (Docket Entry 9 at 1), arguing that this Court does not have jurisdiction over the Complaint because Plaintiff lacks standing and because its claims are unripe. (*See generally* Docket Entry 10.) District courts properly consider a defendant's challenge to standing as a defect in subject matter jurisdiction; a plaintiff's claims will be dismissed for lack of subject matter jurisdiction if it does not have standing. *See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013); *PEM Entities LLC v. Cnty. of Franklin*, 57 F.4th 178, 182 (4th Cir. 2023) ("a claimant's standing implicates a federal court's subject matter jurisdiction").

The existence of subject-matter jurisdiction is a threshold question that a court must address before considering a case's merits. *Samson v. North Carolina*, No. 5:19-CV-443-BO, 2020 WL 6935469, at *2 (E.D.N.C. Nov. 24, 2020) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998)). "Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt." *Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009) (citation omitted). When subject-matter jurisdiction is challenged, the plaintiff has the burden of proving jurisdiction to survive the motion. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647-50 (4th Cir. 1999); *see also Demetres v. East West Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015).

Here, Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202. (Compl. ¶¶ 5, 7; *id.* at 10.) "Because the declaratory judgment standard incorporates jurisdictional considerations, the Court will begin there." *Disability Rts. Texas v. Pacillas*, 690 F. Supp. 3d 654, 668 (W.D. Tex. 2023), *appeal dismissed sub nom. Disability Rts. Texas v. Allen*, No. 23-50704, 2023 WL 10675681 (5th Cir. Oct. 13, 2023). The Federal Declaratory Judgment Act

provides that "[i]n a case of actual controversy within its jurisdiction," a federal district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). However, "[i]n the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995). Thus, the Declaratory Judgment Act "does not impose a mandatory obligation upon the federal courts to make such declarations of rights. Rather, a district court's decision to entertain a claim for declaratory relief is discretionary." *Aetna Cas. & Sur. Co. v. Ind-Com Electric Co.*, 139 F.3d 419, 421 (4th Cir. 1998).

Declaratory relief should be granted only when doing so " 'will serve a useful purpose in clarifying and settling the legal relations in issue, and … when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.' " *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996) (quoting *Aetna Cas. & Sur. Co. v. Quarks*, 92 F.2d 321, 325 (4th Cir. 1937)). In examining the claims for declaratory judgment in the instant Complaint, the undersigned concludes that, for the purposes of assessing the sufficiency of the complaint as to subject-matter jurisdiction, both of the objectives noted above could be served by considering and deciding the declaratory judgment claims. Therefore, the Declaratory Judgment Act provides no support for Defendant's attempt to dismiss pursuant to Rule 12(b)(1). *Accord Carfax, Inc. v. Red Mountain Techs.*, 119 F. Supp. 3d 404, 419 (E.D. Va. 2015). The undersigned turns now to Article III standing's impact on subject-matter jurisdiction.

Article III of the U.S. Constitution confers federal courts jurisdiction only in matters involving an actual "case or controversy[.]" *See Aetna Life Ins. Co. v. Hanworth*, 300 U.S. 227,

239-40 (1937) (citations omitted). Two closely related components of the Article III case-or-controversy requirement are standing and ripeness.[5] *See Wells v. Kiecker*, No. 1:23-CV-113-MR-WCM, 2023 WL 9317431, at *3 (W.D.N.C. Dec. 13, 2023) (unpublished) (collecting cases). For there to be a "case or controversy," a plaintiff must have Article III standing. *Disability Rts. Texas*, 2023 WL 3855082 at *11 (citing *Carney v. Adams*, 592 U.S. 53, 141 (2020)). To establish Article III standing, a plaintiff must show (1) it has "suffered an injury in fact;" (2) there is "a causal connection between the injury and the conduct complained of;" and (3) it is "likely … that the injury will be redressed by a favorable decision" from the court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotations omitted).

A claim should be dismissed as unripe if a plaintiff has not yet suffered injury and any future impact "remains wholly speculative." *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 361 (4th Cir.1996). In determining ripeness, courts "balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration. A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (citations and internal quotation marks omitted). Like the redressability requirement for standing, ripeness doctrine prevents courts from considering a controversy until it is presented in "clean-cut and concrete form." *Rescue Army v. Mun. Ct. of Los Angeles*,

---

[5] "Ripeness analysis holds much in common with standing analysis." *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 759 n.10 (4th Cir. 2013) (ultimately quoting Erwin Chemerinsky, Federal Jurisdiction § 2.4 (4th ed. 2003) ("Although … the questions of who may sue and when they [may] sue seem distinct, in practice there is an obvious overlap between the doctrines of standing and ripeness.").

331 U.S. 549, 584 (1947). As with standing, the party bringing the suit bears the burden of proving ripeness. *See Miller*, 462 F.3d at 319.

Here, Defendants do not clearly differentiate their standing argument from their ripeness argument. (*See generally* Docket Entry 10.) They argue that "this matter is not ripe for judicial review because the court cannot determine if the requested access was unreasonably refused. [Plaintiff's] Complaint should therefore be dismissed for lack of standing." (*Id.* at 4.) Defendants argue that Plaintiff lacks standing because Plaintiff has not experienced a sufficiently concrete injury. (*See* Docket Entry 10 at 6-7.) They contend that Sheriff Page "has not formalized any decision restricting Plaintiff's access to the jail," and that this amounts to an "abstract disagreement over an administrative policy" that should deprive Plaintiff of the right to sue. (*See id.*) Defendants go on to argue that the Complaint fails to allege that they hindered any investigation to which Plaintiff is legally entitled. (*See id.* at 8.) They further argue that, given the risks to safety posed by a jail visit, they gave DRNC reasonable access to RCDC and the people confined there. (*See id.* at 8-12.)

Defendants go on to argue that "[t]he dispute is not ripe for adjudication" because Plaintiff "cannot show an actual concrete 'injury in fact' where [Plaintiff was not] denied reasonable access to a place where [Plaintiff was] entitled to visit." (*Id.* at 12.) Defendants conclude by arguing that the instant action is unfit for judicial review until Plaintiff provides them with a protocol detailing "how [Plaintiff] intend[s] to conduct [its] P&A activities with minimal interference to jail programs[,]" which they claim would enable this Court to "determine the reasonableness of the demanded access and fashion a suitable remedy for the violation." (*See id.* at 12-13.)

11

A defendant may challenge subject-matter jurisdiction facially or factually. *See Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). In a facial challenge, a defendant asserts that the allegations, taken as true, are insufficient to establish subject-matter jurisdiction. *See id.* The court then effectively affords a plaintiff " 'the same procedural protection as he would receive under a rule 12(b)(6) consideration," taking the facts as true and denying the Rule 12(b)(1) motion if the complaint "alleges sufficient facts to invoke subject matter jurisdiction." *Id.* (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). In a factual challenge, a defendant asserts that the jurisdictional allegations are false, and the court may look beyond the complaint to resolve the disputed jurisdictional facts without converting the motion to one for summary judgment. *Kerns*, 585 F.3d at 192-93.

Here, Defendants do not explicitly state whether they intend to bring a facial or a factual challenge to subject-matter jurisdiction. Defendants appear to argue that Plaintiff's allegations are factually insufficient to establish jurisdiction (*see* Docket Entry 10 at 4, 8, 9, 12), which could suggest that they intend to bring a facial challenge. However, Defendants also seem to dispute the veracity of the Complaint when they argue that Plaintiff has made significant omissions or misrepresentations therein (*see id.* at 7) and purport to support this argument by citing to evidence outside the pleadings attached to their Motion to Dismiss (*see* Docket Entries 9-1, 9-2, 9-3), which could suggest that they intend to bring a factual challenge.

In either case, however, it is not clear that Defendants' argument is actually jurisdictional. *See Disability Rights Texas*, 690 F. Supp. 3d at 669. Rather, the essence of Defendants' argument is that RCDC is not subject to DRNC's full authority under the P&A Acts and is therefore not required to permit DRNC to conduct its monitoring visits unless it

acquiesces to the terms set by Defendants. Viewed in this light, Defendants' purported

jurisdictional argument is merely a restatement of the question DRNC and Defendants

dispute: Does DRNC have the authority under the P&A Acts to access all areas of the RCDC

that incarcerated individuals can access and to communicate with all individuals incarcerated

within the jail? (*Cf.* Compl. at 10; Docket Entries 9, 10.) "And that question is one that directly

implicates the *merits* of [DRNC's] action—*not* whether this Court has *jurisdiction* to decide that

question." *Disability Rights Texas*, 690 F. Supp. 3d at 669 (emphasis in original).

Again, DRNC's alleged injury is Defendants' refusal to provide it with the access to

areas and individuals in RCDC that DRNC asserts it has the authority to access under the

P&A Acts. (*See generally* Compl.)

> When a plaintiff's claim of injury in fact depends on legal rights conferred by statute, it is the particular statute and the rights it conveys that guide the standing determination. … [A] court determines whether a plaintiff has standing by evaluating whether the statute grants persons in the plaintiff's position a right to judicial relief. To answer that question here, the Court must assess whether the P&A Acts give [DRNC] the right to obtain the [access] it seeks, which is also the merits dispute. Thus, the Court must conclude that it has jurisdiction and proceed to the merits. Where the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court … is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case.

*See Disability Rights Texas*, 690 F. Supp. 3d at 670 n.67 (cleaned up); *Williamson v. Tucker*, 645 F.2d

404, 415 (5th Cir. 1981); *Bell v. Hood*, 327 U.S. 678 (1945).

> Congress provided P&A systems, like [DRNC], with several authorities, including the right to [access] certain [facilities and persons therein. 42 C.F.R. § 51.42, 45 C.F.R. § 1326.27, 42 U.S.C. §§ 10805(a)(3), 15043(a)(2)(H); 29 U.S.C. § 794e(f)(1)-(4).] In line with its putative [ ]access authority, [DRNC] requested [access to all areas of RCDC accessible by incarcerated persons, to conduct monitoring and speak with individuals therein]. RCDC has refused to provide [said access], which injures [DRNC]. *See … Ala. Disabilities Advoc. Program v. SafetyNet Youthcare, Inc.*, 65 F. Supp. 3d 1312, 1322 (S.D. Ala. 2014) (noting, in a facility-access case, that

13

the P&A system "ha[d] standing because it [sought] to establish that [the defendant's] actions [were] causing injury to the P&A system itself").

*See Disability Rights Texas*, 690 F. Supp. 3d at 670.[6]  In other words,

> [DRNC] cannot access [the people and places] it asserts it has a right to access under the P&A Acts (the injury) because [RCDC] refuses to provide it (the causal connection).  A favorable decision from the Court would redress [DRNC's] alleged injury because the Court would issue a declaratory judgment and permanent injunction in [DRNC's] favor requiring [Defendants] to [provide] the [access DRNC] seeks.  [DRNC] thus has Article III standing.

*See id.* (cleaned up).  Moreover, the Fourth Circuit has recognized that "in those cases where the jurisdictional facts are intertwined with the facts central to the merits of the dispute[,] [i]t is the better view that … the entire factual dispute is appropriately resolved only by a proceeding on the merits." *Adams*, 697 F.2d at 1219 (collecting cases).  Accordingly, the undersigned finds that DRNC has standing to bring the instant action, and that the claims it brings are ripe for adjudication.  Therefore, the undersigned concludes that this Court has subject-matter jurisdiction over the instant action; Defendants' Motion to Dismiss pursuant to Rule 12(b)(1) fails.  The undersigned now turns to the remainder of Defendants' Motion to Dismiss.[7]

---

[6]  The court in *Disability Rights Texas* also referenced *Advoc. Ctr. v. Stalder*, 128 F. Supp. 2d 358, 363 (M.D. La. 1999) (explaining that P&A Systems "ha[ve] standing to bring a lawsuit requesting records" and that if an entity denies the P&A system access to records related to "a claim it is investigating, it suffers a direct injury to its statutory interest").  690 F. Supp. 3d at 670.  The court's reliance on authorities analyzing the merits of standing with regards to access to records and to facilities elucidates the issues' parallel nature and the suitability of the above analysis for both.  *See generally id.*

[7] If a district court does not dismiss under Rule 12(b)(1), it is entitled to treat a Rule 12(b)(1) motion as a direct attack on the merits under Rule 56(c).  *Kerns*, 585 F.3d at 195.  When a contested basis for jurisdiction is an element of a claim, a motion to dismiss should be converted to a motion for summary judgment.  *Rivanna Trawlers Unltd. v. Thompson Trawlers, Inc.*, 840 F.2d 236, 239 (4th Cir. 1988).  However, because it does not appear that a contested basis for jurisdiction is an element of any claim and because no party has moved for conversion to summary judgment, the undersigned declines to do so.

14

### c. **Defendants' 12(b)(6) motion is granted in part and denied in part.**

Defendants argue, pursuant to Rule 12(b)(6), that the Court should dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted. (*See* Docket Entries 9, 10.) For the following reasons, the undersigned agrees as to the § 1983 claims against Sheriff Page and as to all claims against Rockingham County, and otherwise disagrees.

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face' " must be dismissed. *Iqbal*, 556 U.S. at 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct." *Id.*; *see also Simmons v. United Mortg. and Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) ("On a Rule 12(b)(6) motion, a complaint must be dismissed if it does not allege enough facts to state a claim to relief that is plausible on its face.") (citations and quotations omitted).

The "court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, … bare assertions devoid of further factual enhancement[,] … unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com*, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted). In other words, the standard requires a plaintiff to articulate facts, that, when accepted as true, demonstrate the plaintiff has stated a claim that makes it plausible she is entitled to relief. *Francis v. Giacomelli*, 588 F.3d 186, 193

15

(4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678, and *Twombly*, 550 U.S. at 557). The liability of each Defendant is discussed in turn.

### i. Sheriff Page

#### 1. The P&A Acts

"PADD, PAMII,[8] and PAIR help protect and advance the interests of those with mental illness or developmental disabilities." *SafetyNet Youthcare*, 65 F. Supp. 3d at 1317. Collectively, these laws grant a state's P&A system "the powers to investigate allegations of abuse and neglect, respond to rights violations, and provide general advocacy services on behalf of state residents with disabilities or mental illness." *Id.* (citing *Tarwater* 97 F.3d at 497 (discussing "broad remedial framework" of the P&A Acts)). The statutes grant each P&A system certain rights and responsibilities, including the authority to seek remedies on behalf of individuals with disabilities. 42 U.S.C. § 15043(a)(2)(A)(i); *see also* § 10805(a)(1)(B) (giving P&A systems the authority to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State").

To "carry out the purpose" of the laws, the statutes and regulations expressly provide each P&A system with access authority to individuals, records, and public and private facilities. 42 U.S.C. §§ 15043(a)(2)(H); 10805(a)(3) (authorizing "access to facilities in the State providing

---

[8] The short title of the Protection and Advocacy for Mentally Ill Individuals Act of 1986 ("PAMII") was changed in 2000 to the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"). *Disability Rts. New York v. New York State*, No. 17CV6965RRMMMH, 2024 WL 20753, at *7 (E.D.N.Y. Jan. 2, 2024). PAMII was amended in 1991 to substitute the term "individuals with mental illness" for the term "mentally ill individuals" wherever it appeared in the Act. *Id.* at n.4 (citation omitted). The short title, however, remained unchanged until 2000, when Congress amended it. *Id.* The provisions relating to the P&A system requirement were not materially altered by this or any other amendments to the Act. *Id.*

16

care or treatment"); *see also Tarwater*, 97 F.3d at 497 ("It is clear that the Act provides express authority for [P&A systems] to gain broad access to records, facilities, and residents to ensure that the Act's mandates can be effectively pursued."). P&A systems' access to individuals is authorized "at reasonable times … in a location in which services, supports, and other assistance are provided to such an individual." 42 U.S.C. § 15043(a)(2)(H); *see also* 42 C.F.R. § 51.42(c) (a P&A "system shall have reasonable unaccompanied access to facilities including all areas which are used by residents, are accessible to residents, and to programs and their residents at reasonable times, which at a minimum shall include normal working hours and visiting hours").

Additionally, P&A systems' access to individuals and records is available at any time for the purposes of conducting a "full investigation of an incident of abuse or neglect." 42 C.F.R. § 51.42(b); 45 C.F.R. § 1386.22(f). Where a P&A system is not investigating a specific incident, it is entitled to access facilities "at reasonable times" for the purposes of general advocacy (for example, the distribution of information or routine health and safety monitoring). 42 C.F.R. § 51.42(c); 45 C.F.R. § 1386.22(g); *SafetyNet Youthcare*, 65 F. Supp. 3d at 1318-21 (discussing history, intent, and interpretations of PADD, PAMII, and PAIR in detail).

"Congress has consistently sought to assist all developmentally disabled persons[ ] and has routinely acted to ensure [P&A systems] are empowered by law. *See SafetyNet Youthcare*, 65 F. Supp. 3d at 1319. Likewise, with regards to PAMII, Congress has made it clear that it expects that facilities will provide P&A systems with reasonable access to all inpatients and residents in such facilities. *Id.* "Informing a mentally ill individual of his or her rights is a critical function of a [P&A] system." *Id.* (citation omitted). Especially relevant here, PAMII's regulatory language specifically states that "while an investigation involves access to facilities, [P&A]

17

systems have authority in their monitoring role to access facilities regardless of whether or not a complaint has been registered or probable cause exits." *Id.* (citing 62 Fed. Reg. at 53,551-52); *see also Connecticut Off. of Prot. & Advoc. for Persons With Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 242 (2d Cir. 2006) ("Congress intended [P&A] systems not simply to respond to reports of maltreatment, but also to monitor facilities in order to prevent abuse or neglect.").

Lastly, it is noteworthy that "PAIR extends [P&A] services to individuals not otherwise afforded PADD or PAMII protection." *Id.* (citing 29 U.S.C. § 794e(a)(1); 34 C.F.R. §§ 381.1, 381.5(b)). The wide range of disabilities encompassed by PAIR includes "certain persons with physical or sensory disabilities (such as blindness or deafness), some persons with traumatic head injuries incurred after age 22, individuals with neurological impairments such as muscular dystrophy or multiple sclerosis, or some persons with learning disabilities." *See id.* (citation omitted). Relatedly, PATBI extends the reach of P&A systems to access persons with traumatic brain injuries. 42 U.S.C. § 300d-53.

### 2. Plaintiff has plausibly alleged that the P&A Acts apply to RCDC.

Jails, like RCDC, are among the facilities to which the P&A Acts apply. 42 U.S.C. § 10802(3); 42 C.F.R. § 51.2; *see also Michigan Prot. & Advoc. Serv., Inc. v. Miller*, 849 F. Supp. 1202, 1207 (W.D. Mich. 1994) (finding that despite the fact that the main purpose of a jail is not the treatment of mental illness, the term "facilities" in PAMII nevertheless includes jails and prisons if they house individuals with mental illness); *Prot. & Advoc. for Persons With Disabilities v. Armstrong*, 266 F. Supp. 2d 303, 315-17 (D. Conn. 2003) (finding that jails and prisons are facilities under PAIMI); *Ind. Prot. & Advoc. Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.*, 642 F. Supp. 2d 872, 875 (S.D. Ind. 2009) ("Congress has defined 'facilities' to include jails and prisons.").

18

Courts have found that P&A systems need not "make a threshold showing" of mental illness or developmental disabilities among facility residents in order to exercise their access authority. *SafetyNet Youthcare*, 65 F. Supp. 3d at 1322 (collecting cases). "Instead of requiring conclusive evidence that a particular person … qualifies as an individual with mental illness or developmental[ ] disability for the purposes of PADD, PAMII, or PAIR, courts have held that a showing of 'substantial evidence' suffices." *Mich. Protection & Advocacy Serv.* at 1207. " '[E]vidence that a facility has previously housed individuals who are mentally ill, as well as evidence that some current residents may be mentally ill[,] is sufficient under PAMII to merit access by [the P&A system].' " *Armstrong*, 266 F. Supp. 2d at 314 (citations omitted).

It would be premature at the motion to dismiss stage to weigh evidence. *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 558 (4th Cir. 2013) ("On a motion pursuant to Rule 12(b)(6), the court's task is to test the legal feasibility of the complaint without weighing the evidence that might be offered to support or contradict it."). Instead, at this juncture Plaintiff is required only to show through its pleadings that it is plausible that RCDC has previously housed people with mental illness or that some RCDC residents may have a qualifying disability under the P&A Acts. *Cf. id.*

Here, Plaintiff alleges that jailed persons are very likely to have such a disability. (*See* Compl. at 4 n.1.) Plaintiff also alleges that RCDC is a provider of services, care and/or treatment to people with disabilities, since jails operating in North Carolina are required to provide medical and behavioral health services to people in their custody, and because RCDC conducts onsite mental health appointments. (*See id.* ¶ 22; *see also id.* at 5 n.3.) Plaintiff alleges that this creates an additional basis for access. (*See id.* (*cf.* 42 C.F.R. § 51.42(b)).) Plaintiff further alleges that approximately 30 individuals in the jail signed a "consent form" to indicate their willingness to

19

speak with DRNC upon its visit to RCDC. (*Id.* ¶ 32.) Lastly, Plaintiff alleges that Defendants "claimed to transfer, and not to keep individuals with mental illness and developmental disabilities in RCDC." (*Id.* ¶ 26.) Considered together and taken as true, these allegations are sufficient to state a plausible claim that RCDC is a facility that has previously housed and may currently house persons with disabilities such that the P&A Acts apply to RCDC.

### 3. <u>Plaintiff has plausibly alleged that DRNC may access RCDC.</u>

> Through PADD, PAMII, and PAIR, Congress created a nationwide system of organizations with a mandate to provide protection and advocacy for individuals with mental illness or disabilities. The access authority is one of the most important features of the [P&A] system. The three primary types of access—to individuals, their records, and the facilities … in which they live—are key to ensuring the [P&A] system fulfills its Congressional purpose. *Courts have recognized that [P&A] access is fundamental, and [P&A] agencies have almost universally prevailed in litigation based on access.*

*SafetyNet Youthcare*, 65 F. Supp. 3d at 1324 (citation omitted) (emphasis added).

Accordingly, because Plaintiff has plausibly alleged that the P&A Acts apply to RCDC, they have also sufficiently stated a claim upon which the relief that they seek—a requirement that RCDC must comply with the P&A regulatory scheme—may be granted. *See id.* Plaintiff has plausibly claimed that the language of the P&A Acts entitle DRNC to "have reasonable unaccompanied access" to monitor and educate at RCDC (including "all areas of the facility which are used by residents or are accessible to residents") and to access the residents therein at reasonable times. 42 C.F.R. § 51.42(b)-(c); 42 U.S.C. § 10805(a)(3); *see also id.* Courts have found the P&A Acts entitle P&A systems (like DRNC) to access residents[9] and facilities to

---

[9] Said access is not limited to disabled residents. Under 42 U.S.C. § 15043(a)(2)(H), a P&A system "shall have unaccompanied access to *all* residents of a facility at reasonable times, which at a minimum shall include normal working hours and visiting hours, for the purpose of: … [m]onitoring compliance with respect to the rights and safety of service recipients." *J.H. ex rel. Gray v. Hinds Cnty., Miss.*, No. 3:11-CV-327-DPJ-FKB, 2011 WL 3047667, at *2 (S.D. Miss. July 25, 2011) (unpublished)

perform their monitoring and educating functions, despite the lack of a court order, an investigation, or a complaint. *See SafetyNet Youthcare*, 65 F. Supp. 3d at 1325.

Defendants argue that the level of access requested by Plaintiff is unreasonable. (*See* Docket Entry 10 3-13.) The language of the regulations discussed above elucidates what is considered "reasonable" under the P&A Acts. *See SafetyNet Youthcare*, 65 F. Supp. 3d at 1317-24.

> [P&A] access is broad, but it is not unfettered. *Id.* P&A systems must conduct their activities "so as to minimize interference with facility programs, respect residents' privacy interests, and honor a resident's request to terminate an interview." 42 C.F.R. § 51.42(c). "Reasonable access" must also take into account the distinctions between the right of access to facilities versus the right of access to patients, as well as between the right of access for monitoring purposes versus the right of access for educating or advocacy purposes. When a [P&A] system exercises its monitoring function, reasonable access includes unannounced access. … When a [P&A] system exercises its educating function, reasonable access [requires] giving at least 24-hours['] notice before accessing facilities.

*Id.* at 1325. Defendants argue that "Plaintiff does not allege and cannot establish that [Sheriff] Page has refused to provide 'reasonable unaccompanied access' " due to Plaintiff's "refusal to meet [its] regulatory burden" by providing Defendants with "protocols explaining how their monitoring visit will be conducted or how they will respect residents' privacy and honor requests to terminate interviews." (Docket Entry 10 at 4.) For following reasons, the undersigned disagrees.

### 4. <u>Plaintiff has plausibly alleged that it is not required to preemptively provide RCDC with a monitoring protocol.</u>

In its Statement of Interest, the United States argues that "[w]here a facility promptly demonstrates that particular restrictions on access are necessary and consistent with 42 C.F.R.

---

(emphasis added). "The Court finds that [Disability Rights Mississippi's] right to monitor compliance includes reasonable access to non-disabled residents." *Id.* (citing *Penn. Prot. & Advocacy, Inc. v. Roger-Greaves Sch. For Blind*, No. Civ. A. 98-3995, 1999 WL 179797 (E.D. Pa. Mar. 25, 1999) (unpublished)).

§ 51.43, the result may well be an acceptable access protocol. But here, Defendants concede that they denied access to the pods due to safety concerns … without justification of what the specific safety concerns were and why the facility could not mitigate them." (Docket Entry 15 at 8 (citation omitted).) The United States goes on to argue, "neither the applicable statutes nor their implementing regulations require that [a] P&A [system] provide a monitoring protocol prior to accessing a facility. In fact, courts have disfavored imposing access prerequisites on P&As, such as providing advance notice." (Docket Entry 15 at 7.) "[T]he burden is on facilities—not P&A [systems]—to promptly explain in writing the reasons for any denial or delay of access they impose." (Docket Entry 15 at 7.) The undersigned agrees.

Again, when a P&A system monitors, reasonable access includes unannounced access; when it educates, access is reasonable after a P&A System has given 24 hours' notice. *SafetyNet* Youthcare, 65 F. Supp. 3d at 1325; *see also Equip for Equality*, 292 F. Supp. 2d at 1101; *Robbins v. Budke*, 739 F.Supp. 1479 (D.N.M. 1990) (finding that P&A system's ability to observe conditions to which patients were subject was "seriously hindered by the requirement that any tours of the facility take place only with advance notice and only with an administrative chaperon"); *Royer-Greaves Sch. for the Blind*, 1999 WL 179797 at *6 (granting P&A system access to monitor facilities without appointment).

The text of the P&A Acts make it clear that a P&A system is not required to provide a preemptive protocol to monitor a facility, and that an authority responsible for the facility's operation is required to give a written explanation to the P&A system when it restricts its access to said facility. *See* 42 C.F.R. § 51.43 ("Access to facilities … or residents shall not be delayed or denied without the prompt provision of written statements of the reasons for the denial.") The

22

undersigned notes that in cases similar to the instant action, Courts have fashioned injunctive remedies permanently requiring defendants to provide P&A systems with reasonable access to residents and facilities while minimizing interference with the operation of the facility and minimizing inconvenience or distress to residents. *Iowa Prot. & Advoc. Servs., Inc.*, No. C 04-0069, 2004 WL 2270002, at \*23 (N.D. Iowa Sept. 30, 2004), *rev'd on other grounds sub nom. Iowa Prot. & Advoc. Servs. v. Tanager, Inc.*, 427 F.3d 541 (8th Cir. 2005).[10]

Pertinent to the particular circumstances of the instant action, North Carolina law vests the sheriff with the "statutory responsibility for the care and custody of the inmates at the county jail." *Vaught v. Ingram*, No. 5:10-CT-3009-FL, 2011 WL 761482, at \*4 (E.D.N.C. Feb. 24, 2011) (unpublished); *see* N.C. Gen. Stat. § 162-22; *Landry v. North Carolina*, No. 3:10-cv-585-RJC-DCK, 2011 WL 3682788, at \*2 (W.D.N.C. Aug. 23, 2011) (unpublished). Thus, under North Carolina law, any allegations relating to personnel, training, or other law enforcement policies at the county jail fall within the sheriff's policymaking authority and are not attributable to the county. *Jones v. Harrison*, No. 4:12-CV-90-D, 2013 WL 1452861, at \*2 (E.D.N.C. Apr. 9, 2013) (unpublished) (citations omitted).

Here, Plaintiff's Complaint plausibly alleges that the access to RCDC it sought could be considered reasonable under the P&A Acts (*see* Compl. ¶ 2, 18), and the relief it seeks is an

---

[10] At least one court has seen fit to grant injunctive relief which, in pertinent part, restrained a defendant warden from denying a plaintiff P&A system reasonable unaccompanied access to staff and individuals confined in the county juvenile detention center. *Disability Rts. New Jersey v. Barcliff*, No. CV 24-08297, 2024 WL 4471437, at \*3 (D.N.J. Oct. 11, 2024) ("In the interest of maintaining security efforts by the detention center, visits by Plaintiff should be announced in advance. Security personnel would be reasonable and therefore permissible accompaniment." *See* 42 C.F.R. § 51.42(c). "Interviews with individuals at the detention center may be conducted with security personnel out of earshot in order to maintain confidentiality."). This tends to undermine Defendant's assertion that no case has interpreted the practical considerations of jail access with respect to the P&A Acts. (*See* Docket Entry 16 at 3.)

injunction granting reasonable access to RCDC consistent with the P&A Acts (*see id.* at 10-11). While the parties disagree about what constitutes "reasonable" access in this situation, at this juncture, the Court need not make a finding on the reasonableness of the access sought. As shown above, Plaintiff has plausibly alleged that the P&A Acts apply to RCDC, that DRNC is lawfully entitled to access RCDC for monitoring and educational purposes, and that Plaintiff is not required to preemptively provide RCDC with any protocol. Therefore, because Sheriff Page is ultimately responsible for the care and custody of the inmates at RCDC, the undersigned concludes that Plaintiff has stated a plausible claim that Sheriff Page could be liable to Plaintiff for violating the P&A Acts.[11]

### 5.  <u>Plaintiff's § 1983 claim against Sheriff Page fails.</u>

When a plaintiff brings a claim against an officer in their official capacity, the Court treats that claim as a claim against the entity itself. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). To the extent Plaintiff asserts claims against Sheriff Page in his official capacity, the RCSO is effectively a party based on his alleged actions, and the claim is analyzed under § 1983 municipal liability. *See Oliver v. Baity*, 208 F. Supp. 3d 681, 688 (N.C.M.D. 2016) (determining claims against sheriff of Forsyth County in his official capacity are claims against Forsyth County Sheriff's Office itself).

Plaintiff has sued Sheriff Page in his official capacity and brings one claim of liability under § 1983. (Compl. at 1, 10-11, *see also id* ¶¶ 15, 39-40.) Plaintiff alleges that "[a]ll of Defendants' complained-of actions were taken under color of state law for purposes of … § 1983." (*Id.* ¶ 15.)

---

[11] At least one other court has found claims sufficiently stated where they were brought by a P&A plaintiff against a county sheriff defendant and where said plaintiff alleged said defendant violated the P&A Acts at a county jail. *See, e.g.*, *Disability Rts. Texas v. Bishop*, 615 F. Supp. 3d 454, 471 (N.D. Tex. 2022).

Plaintiff further alleges that "Defendants' restrictions and conditions on [DRNC's] exercise of its federally mandated right of access to monitor the jail under Defendants' control deprives [DRNC] of the rights and privileges secured by the Constitution and [federal] laws.' " (*Id.* ¶ 40.)

In order to establish municipal liability, Plaintiff must show: (1) the injury "was caused by a constitutional violation, and (2) the municipality is responsible for that violation." *Wilkerson v. Thrift*, 124 F. Supp. 2d 322, 339-40 (W.D.N.C. 2000). The "municipality is responsible only when the execution of the government's policy or custom … inflicts injury." *Id.* (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)).

Here, although Plaintiff alleges many statutory and regulatory violations, it alleges no specific constitutional violation, nor does it allege that an official policy or custom of the RCSO inflicted its alleged injury. Therefore, Plaintiff's attempt to state a § 1983 claim against Sheriff Page fails. *See S.Y. v. Sampson Cnty. Bd. of Educ.*, No. 7:24-CV-471-D, 2024 WL 4645485, at *12 (E.D.N.C. Oct. 31, 2024); *J.S. ex rel. Simpson v. Thorsen*, 766 F. Supp. 2d 695, 702 (E.D. Va. 2011) ("if there are no underlying constitutional violations by any individual, there can be no municipal liability" (cleaned up)). Accordingly, the undersigned orders that Plaintiff's § 1983 claim against Sheriff Page be dismissed.

### ii. __Rockingham County__

#### 1. __Plaintiff's § 1983 claim against Rockingham County fails.__

Plaintiff alleges that Defendant Rockingham County is vested with the authority to establish and operate RCDC. (Compl. ¶ 14 (citing N.C. Gen. Stat. § 153A-218).) Defendants argue that Rockingham County is not a proper party to this action because Rockingham County is not liable for the alleged acts of Sheriff Page or his deputies. (Docket Entry 10 at 13.)

25

Defendants argue that "Rockingham County's alleged malfeasance is mentioned nowhere in the Complaint. Plaintiff merely alleges that Rockingham County is responsible for funding the jail." (*Id.*) They argue that the violations Plaintiff alleges are against Sheriff Page and not Rockingham County and conclude that Rockingham County should be dismissed from this matter. (*Id.*)

In its opposition memo, Plaintiff argues that Rockingham County is a proper defendant here due to the authority over and responsibility for RCDC conferred to Rockingham County by N.C. Gen. Stat. §§ 153A-218, 153A-223, and 153A-225. (Docket Entry 13 at 16.) Plaintiff argues that these statutes authorize Rockingham County to appropriate the funds to run RCDC and obligate it "to take corrective action or close the jail when it is not in compliance with standards for conditions for confinement." (*Id.*) Plaintiff also argues that these statutes require Rockingham County "to develop a health care plan and pay for the health[ ]care provided to people incarcerated in RCDC." (*Id.*) Plaintiff argues that Rockingham County is responsible for the safety, health and well-being of RCDC and the individuals with disabilities housed therein. (*See id.*)

Plaintiff goes on to argue that "matters of concern in P&A monitoring are within both Defendants' authority. Even if the county delegates some of its authority to the Sheriff in practice, the county remains liable for matters within its statutory policymaking authority." (*Id.* at 17.) Plaintiff further argues that "[i]n light of the expansiveness of the monitoring authority granted to the P&As by Congress, [DRNC] is likely to encounter and identify issues within RCDC that fall within both Defendants' decisionmaking authority such that both are properly named as Defendants." Plaintiff also argues that it notified Rockingham County of its intent to monitor RCDC by communicating with Albright. (*Id.* at 18.) Plaintiff concludes that it has established "that there are questions of law and fact regarding Rockingham County's

26

responsibility for RCDC such that it would be inappropriate to dismiss them as a defendant at this juncture." (*Id.* at 18-19.)

Again, Plaintiff mentions § 1983 in its complaint (Compl. ¶¶ 6, 15, 39-40; *see also id.* at 11, 13), but it does not say which individual and/or entity violated its "constitutional rights and privileges[,]" nor does it specify which right and/or privilege secured by the Constitution it believes Defendants violated. The extent of Plaintiff's allegations against Rockingham County itself in the Complaint is that N.C. Gen. Stat. § 153A-218 vests Rockingham County with the authority to establish and operate RCDC. (*Id.* ¶ 14.) Plaintiff also alleges that Albright communicated to DRNC that it would not be provided the access it sought to monitor at RCDC. (*Id.* ¶ 23.) The remainder of Plaintiff's allegations allege "Defendants" denied Plaintiff access to RCDC, but do not specify any wrongdoing carried out by Rockingham County itself nor specify which actor in particular accomplished said denial. (*See generally id.*)

As a threshold matter, the undersigned notes that a plaintiff may not amend its complaint through arguments raised in opposition to a motion to dismiss. *Anderson v. DHHS/Cent. Reg'l Hosp.*, No. 5:24-CV-299-BO-KS, 2025 WL 510387, at *4 (E.D.N.C. Feb. 14, 2025). It is impermissible for the Court to consider facts or contentions made for the first time in a brief in opposition to a motion to dismiss. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 449 (4th Cir. 2011).

Accordingly, the undersigned will not consider the arguments made by Plaintiff in its opposition memo that a county may be properly named as a defendant and could face § 1983 liability for its role in developing an inadequate plan for providing medical care to prisoners or for delegating its authority to establish final policymaking authority to a sheriff. (Docket

Entry 13 at 16-17.) If Plaintiff wishes to sue Rockingham County for its role in providing an inadequate medical care plan at RCDC under N.C.G.S. § 153A-225,[12] to allege that Rockingham County delegated its policymaking authority to Sheriff Page, or to name Albright as a defendant, it may file a separate action to do so. *Cf. Hunter v. Town of Mocksville, N.C.*, 897 F.3d 538, 555 (4th Cir. 2018) (citation omitted). Such actions are not properly before the Court in the instant matter. The undersigned turns now to the viability of Plaintiff's § 1983 claim against Rockingham County.

Counties are liable as "persons" under § 1983 for constitutional torts caused by the county. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989). "A constitutional tort is any action for damages for a violation of a constitutional right against a government or individual defendants." *Fulton v. Fulton Cnty. Bd. of Commissioners*, No. 1:20-CV-01936-SCJ, 2021 WL 8945248, at *3 (N.D. Ga. Feb. 24, 2021) (unpublished). A county may only be held liable under § 1983 for acts for which it has final "policymaking" authority. *Lewis v. Peterkin*, No. 1:19CV418, 2020 WL 5700755, at *2 (M.D.N.C. Sept. 24, 2020) (unpublished); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, (1988); *McMillian v. Monroe Cnty.*, 520 U.S. 781, 784 (1997) ("[A] local government is liable under § 1983 for its policies that cause constitutional torts."). Whether a county has final policymaking authority on a particular issue is an inquiry governed by state law. *Praprotnik*, 485 U.S. at 123; *Stockton v. Wake County*, 173 F. Supp. 3d 292, 303 (E.D.N.C. March 24, 2016).

---

[12] Courts have recognized that N.C.G.S. § 153A-225 can form the basis for county liability under § 1983. *Jones*, 2013 WL 1452861, at *2; *Lewis v. Peterkin*, 2020 WL 5700755 at *2; *King v. Blackwood*, No. 1:21CV383, 2023 WL 4163141, at *10 (M.D.N.C. June 23, 2023), *report and recommendation adopted*, No. 1:21-CV-383, 2023 WL 4902517 (M.D.N.C. Aug. 1, 2023). However, as discussed above, Plaintiff did not mention N.C.G.S. § 153A-225 in its Complaint nor allege a cause of action pursuant to it, and the arguments raised in its opposition memo form no basis for the court to recognize any such claim.

28

Again, North Carolina law provides that county sheriffs are responsible for the care and custody of the county jail. N.C. Gen. Stat § 162-22. Therefore, "any allegations relating to personnel, training, or other law enforcement policies at the county jail fall within the sheriff's policymaking authority and are not attributable to the county." *Jones*, 2013 WL 1452861, at *2. The doctrine of *respondeat superior* generally does not apply to a § 1983 action. *Iqbal*, 556 U.S. at 676-77; *Monell*, 436 U.S. at 694; *Carter v. Morris*, 164 F.3d 215, 218, 220-21 (4th Cir.1999); *Shaw v. Stroud*, 13 F.3d 791, 798-99 (4th Cir. 1994).

Alleging that a county employee committed a constitutional violation is necessary, but not sufficient, to state a claim against a county. *Stockton v. Wake Cnty.*, 173 F. Supp. 3d 292, 302 (E.D.N.C. 2016). A county may be found liable under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694; *see Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).[13] Therefore, a county may not be found liable under § 1983 based on a theory of *respondeat superior* or simply for employing a tortfeasor. *See, e.g., Connick v. Thompson*, 563 U.S. 51, 60-64 (2011); *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997).

Lastly, again, to state a claim for municipal liability under § 1983, "a plaintiff must demonstrate an underlying constitutional violation." *See Turner v. Thomas*, 313 F. Supp. 3d 704, 717 (W.D. Va. 2018), *aff'd*, 930 F.3d 640 (4th Cir. 2019) (collecting cases). "With no undergirding violation, [a municipality] has no § 1983 municipal liability." *Id.*; *S.P. v. City of*

---

[13] "*Monell* applies to § 1983 claims for injunctive relief." *York v. City of Burlington*, 225 F. Supp. 3d 341, 350 n.7 (M.D.N.C. 2016) (citing *L.A. Cty., Cal. v. Humphries*, 562 U.S. 29 (2010)).

*Takoma Park*, 134 F.3d 260, 274 (4th Cir.1998) (a municipality "necessarily is not liable for any alleged injuries" where "no constitutional violation occurred").

Here, again, Plaintiff's Complaint does not identify any underlying constitutional violation. This alone is sufficient to bar its claim for *Monell* liability against Rockingham County. The extent of Plaintiff's alleged injury arises from the violation of rights conferred to it by federal statutes and regulations (the P&A Acts), not the Constitution.

Moreover, Plaintiff's Complaint contains no allegations that Rockingham County is responsible for the policies of RCDC. (*See generally* Compl.) In fact, the Complaint contains no mention whatsoever of any policy or policymaking authority. (*See id.*) The only authority it cites is N.C.G.S. § 153A-218, which alone forms no basis for an action under § 1983. *Reid v. Johnston County*, 688 F.Supp. 200 (E.D.N.C. 1988), *aff'd per curiam sub nom. Reid v. Kayye*, 885 F.2d 129 (4th Cir. 1989) (granting defendant county's motion to dismiss § 1983 action because plaintiffs, who attempted to rely on N.C.G.S. § 153A-218 as a basis of liability, "[did] not demonstrate[ ] that defendants' actions, taken under color of state law, [had] in any way *caused* existing or past constitutionally deficient conditions at the … County Jail'") (emphasis in original); *Multiple Claimants v. N. Carolina Dep't of Health & Hum. Servs.*, 176 N.C. App. 278, 296, 626 S.E.2d 666, 677-78 (2006), *aff'd as modified sub nom. Multiple Claimants v. N. Carolina Dep't of Health & Hum. Servs., Div. of Facility Servs., Jails & Det. Servs.*, 361 N.C. 372, 646 S.E.2d 356 (2007) (state court decisions confirming the finding in *Reid*).

Furthermore, Rockingham County is not made a proper party to this action due to any alleged misconduct by RCDC personnel. To the extent any such misconduct occurred at RCDC and involves Sheriff Page, his deputies, and/or officials contracted by RCDC, it does not create

30

liability for Rockingham County. "In North Carolina, the Office of Sheriff is a legal entity, established by the state constitution and state statutes, separate and distinct from the county because a sheriff is elected by the people, not employed by the county." *Hines v. Johnson*, No. 1:19CV515, 2020 WL 1516397, at \*4 (M.D.N.C. Mar. 30, 2020) (unpublished); *Breen v. Mecklenburg County*, 2006 WL 2830956 at \*3 (W.D.N.C.2006) ("a county cannot be held liable for constitutional or other civil wrongs committed by a sheriff or his employees") (collecting cases).

Finally, to the extent Plaintiff alleges that Rockingham County faces liability here due to the actions of Albright, such a claim fails due to the absence of *respondeat superior* liability available against counties. Therefore, Plaintiff's Complaint fails to state a claim that Rockingham County could face liability under § 1983. Accordingly, the undersigned orders that the § 1983 claim against Rockingham County be dismissed.

### 2. **Plaintiff's claim under the P&A Acts against Rockingham County fails.**

With regard to its claim against Rockingham County under its first cause of action, Plaintiff has alleged that Albright communicated to DRNC that it would not be given the access it sought to monitor at RCDC. (*Id.* ¶ 23.) Plaintiff has also attached more than 100 pages of email correspondence to its opposition memo, most of which is between Albright and Woollard. (*See generally* Docket Entry 13-1.) As a threshold matter, the undersigned notes that the Court may properly consider such attachments without converting the instant action into a motion for summary judgment so long as the attachments are integral to the complaint and authentic. *See Decoster v. Becerra,* 119 F.4th 332 (4th Cir. 2024). No party disputes the authenticity of the email correspondence contained in the attachment.

An "integral" document is one that by its "very existence, and not the mere information it contains, gives rise to the legal rights asserted." *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007); *see also Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (suggesting an attached document may be "integral" if the plaintiff's claims "turn on" or are "otherwise based on" the contents of that document). A document is not necessarily "integral" just because it is referenced or quoted in the complaint. *See Goines*, 822 F.3d at 166.

Here, the email correspondence contained in the attachment is integral to the Complaint because its existence, not merely the information contained therein, is used by Plaintiff to allege that Rockingham County, via Albright, is one of the entities that is in control of RCDC and that it is actively imposing limitations on the access Plaintiff claims to be entitled to under the P&A Acts. Therefore, the Court may properly consider the email correspondence here without converting the instant action into a motion for summary judgment.[14]

Much of said correspondence deals with DRNC, via Woollard, attempting to notify RCDC, via Albright, of its intent to conduct a monitoring visit, to set the terms of said visit, and to set a date and time for it to occur. (*See* Docket Entry 13-1.) When Woollard states to Albright that he is planning to follow up with the RCSO and asks Albright about his communication preferences, Albright informs Woollard, "I would prefer that the emails be directed to me and I will communicate with the Sheriff." (*Id.* at 15, 18, 22, 26.) However, it is not clear whether Albright was explicitly authorized by Sheriff Page to circumscribe DRNC's

---

[14] *See WorkingFilms, Inc. v. Working Narratives, Inc.*, No. 7:20-CV-00139-M, 2021 WL 1196189, at *7 (E.D.N.C. Mar. 29, 2021) (unpublished) (email exchange neither attached to nor expressly incorporated in complaint could be considered without converting action to motion for summary judgment; court stated that to extent plaintiff's claims turned on, or were based on, information contained in these documents and said documents were relevant to matters at issue, court would consider them).

access to RCDC in his apparent role as a representative of the RCSO and/or RCDC, nor is it clear whether Albright meant for his communications to DRNC be construed as his own or as Sheriff Page's and/or the RCSO's.

Some of the attached correspondence between Woollard and Albright is relevant to this issue. For example, in a letter dated January 31, 2023, Albright states, in pertinent part, "[y]our January 23, 2023[,] letter to Sheriff Page has been referred to me for response." (*Id.* at 10.) However, Woollard continues to address some of his messages to Sheriff Page and to refer to Sheriff Page and the RCSO throughout the correspondence. (*See id.* at 5, 6, 13, 18, 21, 25, 26, 39, 61, 62, 66, 72, 73, 77, 78, 80, 86, 87, 92, 93, 94, 99, 100, 101, 108-09, 110, 116, 117, 118.) Albright himself also states, "[t]he Sheriff is responsible for the operation of the jail" (*id.* at 29, 36), and that "[t]he Sheriff allows visitation at reasonable times during normal working hours or when the [S]heriff would normally allow visitation at the jail…." (*Id.* at 47.) Albright also makes numerous references to the Sheriff, his authority to make decisions about which residents are housed at RCDC, and his authority to otherwise control access to RCDC. (*See id.* at 53, 61, 67, 79, 109, 123, 131, 137.)

Relatedly, in the Affidavit of Samuel Scott Page, Sheriff Page states, "[t]hrough the Rockingham County Attorney, I requested a copy of the [DRNC] jail tour protocol for conducting jail tours in accordance with the federally mandated requirements." (Docket Entry 9-1 at 2.) In the Affidavit of Windell Brown, Brown states, "I met with the representatives of [DRNC] in order to take them on the jail tour previously arranged under a protocol developed by the Rockingham County Attorney." (Docket Entry 9-2 at 1.) Brown goes on to state that it was "the County Attorney" who prepared the "consent forms" distributed to inmates discussed above. (*Id.*)

33

Considered together, these would seem to suggest that Albright has attempted to serve as an intermediary between Rockingham County and Sheriff Page and/or RCSO, and that Rockingham County developed a protocol for DRNC to abide by when monitoring RCDC. These suggestions, if true, would undermine Defendants' argument that RCDC and Sheriff Page are completely independent of Rockingham County with respect to the dispute over access to the facility and its residents. (*See* Docket Entry 10 at 13.)

However, there is no explicit allegation by any party that Albright himself is authorized to limit Plaintiff's access to RCDC, and throughout much of the correspondence it appears that Albright is merely speaking on behalf of Sheriff Page. The record suggests that Albright is employed by Rockingham County—not by Sheriff Page, not by the RCSO, and not by RCDC. William L. Hill ("Hill") is the attorney of record for the Defendants—both Sheriff Page and Rockingham County—in the instant action (Docket Entry 8), and he has explicitly and repeatedly argued to this Court that Rockingham County has no authority, responsibility, or liability for RCDC, and that Rockingham County must therefore be dismissed from this matter. (*See generally* Docket Entry 10.)

Ultimately, again, under North Carolina law, "the sheriff, not the county encompassing his jurisdiction, has final policymaking authority over hiring, supervising, and discharging personnel in the sheriff's office." *Parker v. Bladen County*, 583 F.Supp.2d 736, 739 (E.D.N.C. June 27, 2008), 583 F.Supp.2d at 739 (citing *Worrell v. Bedsole*, No. 95-2816, 1997 WL 153830, at *5 (4th Cir. Apr.3, 1997) (unpublished); *Little v. Smith*, 114 F.Supp.2d 437, 446 (W.D.N.C.2000); *Clark v. Burke County*, 117 N.C. App. 85, 89, 450 S.E.2d 747, 749 (1994)).

Here, although Plaintiff mentions Albright, it makes no allegations particular to Rockingham County, nor do its allegations support a possible claim against Rockingham County, even with amendment. *See Fair v. Lincoln Cnty.*, No. 5:20-CV-00066-MR, 2020 WL 5255132, at *3 (W.D.N.C. Sept. 2, 2020). The Court will, therefore, dismiss Rockingham County as a Defendant is this matter. *See id.*; *see also Gorham v. Cnty. of Onslow*, No. 4:07-CV-114-H, 2008 WL 11381868, at *2 (E.D.N.C. Aug. 19, 2008) ("the county cannot be held liable for the actions of the sheriff and/or his deputies"); *Parker v. Bladen Cnty.*, 583 F. Supp. 2d 736, 739 (E.D.N.C. 2008) ("Under North Carolina law, sheriffs have substantial independence from county government."); *Kelley v. Durham Cnty.*, No. 1:12CV376, 2013 WL 527242, at *4 (M.D.N.C. Feb. 11, 2013) (similar); *Harter v. Vernon*, 953 F. Supp. 685, 692 (M.D.N.C.) (similar), *aff'd*, 101 F.3d 334 (4th Cir. 1996), *and on reconsideration*, 980 F. Supp. 162 (M.D.N.C. 1997); *Goodwin v. Furr*, 25 F. Supp. 2d 713, 717 (M.D.N.C. 1998) ("…the County is not a proper defendant with respect to the Sheriff's actions in this case under federal law or state law, and the County shall be dismissed as a defendant.").

Plaintiff has failed to plausibly state a claim under the P&A Acts against Rockingham County. Therefore, the undersigned concludes that Sheriff Page is the only party properly named as a defendant in the instant action moving forward. Accordingly, the undersigned orders that Defendants' motion to dismiss as to Rockingham County is granted. The undersigned turns now to Plaintiff's request for declaratory and injunctive relief.

### d. **To the extent Defendants' Motion to Dismiss seeks to limit Plaintiff's declaratory and injunctive relief, it is denied.**

Plaintiff requests a declaratory judgment stating that Defendants violated § 1983 and the P&A Acts by refusing to provide DRNC reasonable access to all areas of RCDC that incarcerated individuals can access and to allow DRNC to communicate with all individuals

incarcerated within the jail. (Compl. at 10.) Plaintiff further requests permanent injunctive relief requiring Defendants to provide DRNC with immediate access to RCDC and the individuals housed therein consistent with the full scope of DRNC's federal monitoring authority under the P&A Acts, and requests that this Court retain jurisdiction over this action to ensure Defendants' compliance with the mandates of the P&A Acts. (*Id.* at 10-11.)[15]

"At this juncture, dismissing Plaintiff['s] request for a declaratory judgment and permanent injunction is premature, until this case is concluded through dispositive motions or a judgment on the merits." *Eagle Paper Int'l, Inc. v. Cont'l Paper Grading Co.*, 726 F. Supp. 3d 541, 547 (E.D. Va. 2024); *see also Chachkes v. David*, No. 20-CV-2879 (LJL), 2021 WL 101130, at *14 (S.D.N.Y. Jan. 12, 2021) (unpublished) ("[Plaintiff] has not moved for a preliminary injunction and the attack on the request for permanent injunctive relief is premature here at the motion to dismiss stage."); *United States v. Spectrum Brands, Inc.*, 218 F. Supp.3d 794, 825

---

[15] Some courts have entered declaratory and injunctive relief in favor of P&A system plaintiffs in other cases similar to the instant action. *See, e.g.*, Barcliff, 2024 WL 4471437 at *3 (enjoining warden defendant from denying P&A system plaintiff access to juvenile detention center and individuals confined therein); *SafetyNet Youthcare*, 65 F. Supp. 3d 1312 (finding that P&A system "suffered an irreparable injury by being denied access to fulfill its statutorily authorized legal duty, monetary damages will not fix the problem, a remedy in equity is warranted, and the public interest is served by a permanent injunction" and awarding injunctive relief mandating facility to give P&A system access); *Armstrong*, 266 F. Supp. 2d at 322 (similar); *Mississippi Prot. & Advoc. Sys., Inc. v. Cotten*, 929 F.2d 1054, 1059 (5th Cir. 1991) (upholding injunction granting P&A system access to all of defendant's residents, with time and place restrictions tailored to minimize interference with defendant's programs; removed requirement of written permission from residents before P&A system could interview residents; required defendant to provide P&A system with private room to meet with residents; and required defendant to inform new residents about the services offered by the P&A system); *Kentucky Prot. & Advoc. Div. v. Hall*, No. CIV.A.3:01CV-538-H, 2001 WL 34792531, at *2 (W.D. Ky. Sept. 24, 2001) (unpublished) (granting declaratory relief to the plaintiff recognizing its legal rights under certain P&A Acts to access the defendant's facility). Other courts have ordered parties to collaborate in drafting injunctive orders and/or access protocols consistent with the courts' findings in favor of P&A plaintiffs. *See, e.g., J.H. ex rel. Gray*, 2011 WL 3047667; *Mississippi Protection & Advocacy System, Inc. v. Cotten*, No. J87-0503(L), 1989 WL 224953 (S.D. Miss. Aug. 4, 1989); *Equip for Equality*, 292 F. Supp. 2d at 1102; *Protection & Advocacy Sys., Inc. v. Freudenthal*, 412 F.Supp.2d 1211, 1212 (D. Wyo. 2006); *SafetyNet Youthcare*, 65 F. Supp. 3d at 1326.

(W.D. Wis. 2016) ("rather than dismissing plaintiff's claim for injunctive relief at the pleading (or even summary judgment) stage, the more appropriate course of action is to evaluate proposed language for a permanent injunction under the … legal standard and a further development of the facts"). Accordingly, the Court will address DRNC's request for declaratory and injunctive relief at the appropriate time, *Equal Emp. Opportunity Comm'n v. Keystone RV Co.*, No. 3:22-CV-831 DRL, 2024 WL 1299587, at *11 (N.D. Ind. Mar. 27, 2024), and at this juncture orders that Defendants' Motion to Dismiss is denied to the extent it seeks to limit Plaintiff's declaratory and injunctive relief.

### e. **Mediation**

Local Civil Rule 83.9b(b) authorizes the Court, "[i]n its discretion, to order a mediated settlement conference in any action not automatically selected" for mediation under Local Rule 83.9b(a). This action has not been automatically selected under Local Civil Rule 83.9b(a). The procedures for mediated settlement conferences are governed by Local Civil Rules 83.9a through 83.9f.[16] The purpose of mediated settlement conferences

> is to provide for an informal process conducted by a mediator with the objective of helping the parties reach a mutually acceptable settlement of their dispute. The rules are not intended to force settlement upon any party. The rules shall be construed to secure the speedy, fair, and economical resolution of controversies while preserving the right of all parties to a conventional trial.

M.D.N.C. LR 83.9a.

A court has broad authority to control its docket to grant judicial remedies and to exercise its discretion to stay cases. *See N.C. Eye Bank, Inc. v. High Energy Ozone, LLC*, No.

---

[16] Further details regarding mediation are available at the website for the Middle District of North Carolina, https://www.ncmd.uscourts.gov/mediation.

37

1:19CV614, 2019 WL 6730961, at \*4 (M.D.N.C. Dec. 11, 2019) (unpublished), *report and recommendation adopted*, No. 1:19CV614, 2020 WL 13582165 (M.D.N.C. Jan. 16, 2020); (ultimately citing *Halim v. Great Galsby's Auction Gallery, Inc.*, 516 F.3d 557, 561 (7th Cir. 2008); *Kane Builders S & D, Inc. v. Maryland CVS Pharmacy, LLC*, No. 12-3775, 2013 WL 2948381 (D. Md. June 13, 2013) ("[W]hen enforcing agreements to mediate, 'district courts have inherent, discretionary authority to issue stays in many circumstances, and granting a stay to permit mediation (or to require it) will often be appropriate.' " (citation omitted)).

Here, the undersigned orders Plaintiff and Sheriff Page to participate in a mediated settlement conference, the purpose of which is to reach a mutually acceptable settlement of the instant dispute. Said mediation shall take place within 60 days of the issuance of this order. The parties are directed to engage the mediation process cooperatively, courteously, and in good faith, and they are directed to comply with all applicable Local Rules. *See, e.g.*, M.D.N.C. LR 83.9a through 83.9f. Pursuant to the Court's authority and discretion to control its docket, the undersigned orders that the instant action is stayed pending the resolution of said mediation.

### III. CONCLUSION

In sum, the undersigned concludes that Plaintiff has established Article III standing necessary to confer this Court's limited jurisdiction over the instant action. The undersigned further concludes that Defendants' motions pursuant to 12(b)(1) and 12(b)(2) are meritless and form no basis for dismissal of any portion of Plaintiff's Complaint. Moreover, the undersigned concludes that, because Plaintiff has failed to state any plausible claim against Rockingham County, Rockingham County is dismissed as a defendant from this action. Lastly, the undersigned concludes that granting the declaratory judgment and permanent injunction

38

sought by Plaintiff would be premature at this juncture, and that it would also be premature to grant Defendant's Motion to Dismiss to the extent it seeks to deny Plaintiff's claim to said declaratory and injunctive relief. [17] Therefore,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss (Docket Entry 9) is **GRANTED IN PART** and **DENIED IN PART**. Accordingly, the undersigned **ORDERS** that as to Plaintiff's § 1983 claims against Sheriff Page and as to all claims against Rockingham County, said motion is **GRANTED**, and that said motion is otherwise **DENIED**.

**IT IS FURTHER ORDERED** that the parties participate in a Court-ordered mediated settlement conference pursuant to the Local Rules as stated herein, to be held within sixty (60) days of the issuance of this Order, and that the instant action is stayed pending resolution of said mediation.

_____/s/ Joe L. Webster_____
United States Magistrate Judge

March 11, 2025
Durham, North Carolina

---

[17] Again, in its discretion, the Court concludes that the United States is entitled to any necessary leave to file its Statement of Interest.